IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2025 Session

**STATE OF TENNESSEE v. REX A. MARTIN**

**Appeal from the Circuit Court for Rutherford County**
**No. F 87143  Howard W. Wilson, Chancellor**

———————————————————

**No. M2024-00189-CCA-R3-CD**

———————————————————

The defendant, Rex A. Martin, was convicted by a Rutherford County Circuit Court jury of two counts of aggravated kidnapping, two counts of aggravated assault, assault, preventing another from making an emergency call, possession of a firearm while under a court order, and possession of a firearm during the commission of a dangerous felony, for which he was sentenced to an effective term of fifteen years in the Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence as to seven of his eight convictions - aggravated kidnapping, aggravated assault, assault, preventing another from making an emergency call, and possessing a firearm during the commission of a dangerous felony.  Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Patrick T. McNally, Nashville, Tennessee (on appeal); Gerald L. Melton, District Public Defender; and Caleb B. McCain and Billie Zimmerman, Assistant District Public Defenders (at trial), for the appellant, Rex A. Martin.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sarah N. Davis and John Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## *Facts and Procedural History*

During the late evening hours of May 17, 2021, a martial dispute over finances spiraled into an encounter that resulted in the defendant being charged with two counts of especially aggravated kidnapping, three counts of aggravated assault, and one count each of preventing another from making an emergency call, possession of a firearm while under a court order, and possession of a firearm during the commission of a dangerous felony.[1] The victim and the defendant, who married in May 2010 and moved to Rutherford County in May 2016, testified to rather different accounts of the incident.

Michella Martin, the fifty-year-old victim, testified that she and the defendant were regularly arguing over money during the time period of the incident. The victim worked for the Veterans Affairs Medical Center out of a home office above the garage from 7:00 a.m. to 3:30 p.m. and would often work an overtime shift from 7:00 p.m. to 11:00 p.m. as well. Though the office was above the garage, there was a landing upon entry into the area, and the office was recessed, requiring one to descend three stairs into the office. The defendant worked for Bridgestone Tires as a maintenance engineer, typically overnight from 7:00 p.m. to 7:00 a.m., but also often worked overtime. The Bridgestone facility was a 45-minute drive from the couple's home, requiring the defendant to generally leave the house around 5:30 p.m.

On May 17, 2021, the victim worked her regular daytime shift and started working an evening overtime shift around 6:00 p.m. or 7:00 p.m. Sometime after the defendant was at work, around 7:30 p.m., the victim and the defendant began to argue about finances over text messages. The victim found the timing of the argument problematic as she was trying to work and was also displeased that the defendant was asking her to give him funds that she was earning for overtime because she usually kept her overtime earnings separately. The victim admitted that the exchange between the two of them was "not nice." At one point, the defendant sent a text that the victim took as threatening, "I don[']t think it best to go round kicking me right now," to which the victim responded, "Don't threaten me cause I ain't skirred."

The back-and-forth bickering over finances and who paid for various expenses continued for about twenty minutes until the defendant wrote, "[L]et[']s just sell the house [and] split it down the middle[.] I[']ve had enough[.]" The victim reminded the defendant that the house could not be sold "until repairs are made," but then said, "Take ur Harley, ur car, ur s**t & get the f**k out. There is no equity to split, since u had to refinance to pay ur debts." After that, the victim placed her phone in a desk drawer and went back to

---

[1] The defendant was also charged with two counts of possession of a weapon with a prior domestic conviction, but the State dismissed those charges before trial and renumbered the original indictment.

- 2 -

her tasks. Although it was not seen until later, the next text on the victim's phone from the defendant was at 11:53 p.m. when the defendant texted, "BYE[.]"

Between 10:00 p.m. and 10:30 p.m., the victim looked up to see the defendant descending the steps into her office and was surprised to see him home early from work. The defendant said to the victim, "So take my s**t and leave, huh?" The victim "just agreed to what he said" because she had work left to complete before her shift ended and "didn't want to argue with him." The defendant shoved items off the victim's desk, sat down on the edge, and began speaking to her. The defendant removed the victim's glasses, but she grabbed them back and told him that she had work to do. The defendant removed the victim's glasses again, giving her the impression that he was going to kiss her, but instead said he was going to kill her. The victim responded, "You are?" The defendant answered, "Yes." Expecting the defendant to pull out a handgun, the victim sat upright and told him that she was ready. The defendant replied, "No, motherf***er, you're gonna feel it."

At that, the defendant lifted the victim out of her chair and began striking her in the head. The defendant got the victim on the floor, pinning both of her arms with his knees, and continued to hit her all over the face with closed fists. While the defendant hit the victim, he told her "now you won't have nobody." The defendant then placed both of his hands around the victim's neck and began to choke her. The choking was "such misery" and "terrible," and the victim prayed to pass out. However, while the victim was praying to lose consciousness, she noticed that the hunting knife the defendant wore on a chain around his neck was possibly in her reach and grabbed at it. The defendant took the knife, removed it from the sheath, and held it to the victim's throat, breaking the skin. The defendant raised his hand and dropped the knife but then returned to hitting and choking the victim.

Eventually, the defendant paused his attack and sat down on the sofa in the room. The victim tried to catch her breath and began coughing and vomiting. She told the defendant that she loved him and begged him to stop. The defendant looked at the victim, and she expected him to tell her that he loved her as well. Instead, the defendant surprised the victim by yelling, "Why did you make me do this? Why did you unleash the beast?" The victim continued to tell the defendant that she loved him and crawled over to him on the sofa, saying, "Let's just go lay down, and we'll talk about it later." The defendant responded, "No, you don't. You are just saying that."

The defendant led the victim downstairs to the main area of the house. The couple's elderly dog was anxious, and the victim picked her up. The victim went out the back door onto the deck, acting like she was taking the dog to use the bathroom but then turned toward the neighbor's house in an attempt to leave. However, the defendant "caught" her and

brought her back into the kitchen. The victim asked the defendant to take her to the emergency room because she was worried that her retina was damaged, but the defendant said, "No, you are not going to the ER." The defendant told the victim that he "wasn't going to jail." The victim requested a towel, and the defendant wet one and gave it to her. While the victim "dabb[ed] her face" with the towel, the defendant "said that he was going to have to tie [her] up."

The defendant took the victim to their bedroom, inclined the head of their adjustable bed, and laid the victim on the bed. The defendant secured the victim's wrists and legs with duct tape and then left the room to retrieve some tools. The defendant removed the doorknob and told the victim that he would call someone to let her out. The defendant left the room, but the victim could hear him walking about inside the house for the next 30 to 40 minutes. In the meanwhile, the victim "wiggl[ed] and twist[ed]" against the duct tape in an attempt to loosen it.

When the victim heard the truck start and sound as though to drive away, she "flipped" off the bed and loosened the duct tape enough to walk. The victim retrieved a long hunting knife from the armoire in the bedroom but could not get into a position to cut her hands free. However, the victim was able to use the knife to wedge open the bedroom door. With her legs still duct-taped together, the victim crawled to her office upstairs to get her cellphone. The victim's phone was missing from the drawer where she had put it earlier, but she found an inactive phone that she used for playing music through a Bluetooth speaker. The victim was able to use that phone to make an emergency call, using a combination of her tongue, nose, and fingers to dial. Because the phone was still connected to the Bluetooth speaker, it was often difficult for the parties to understand each other. However, the victim was able to relay what had happened, that she needed medical attention, and that the defendant was armed. While the victim was on the phone with 911, she heard the truck return and made her way back to the bedroom so the defendant would not know she had escaped. A short while later, the police forced open the bedroom door and told the victim she was safe.

The victim was taken to the hospital by ambulance and received treatment for her injuries by Dr. Daniel Evans. According to Dr. Evans, the victim "presented like a significant, traumatic patient." The victim had "obvious external signs of blunt trauma. She had blood all over her face. And was in clear distress." The doctor expressed that it was initially difficult to assess the victim "because of all the blood[.]" The victim displayed ligature marks on the neck along with petechia, small hemorrhages in the skin and eye, consistent with the reported strangulation. The victim recalled that she sustained lacerations to her face and lip, her nose cavity was collapsed, and her face was swollen. She had extensive bruising from her chin to her chest, as well as on her arms. The victim's left hand was broken, in a defensive wound-type injury known as a "night stick injury,"

- 4 -

requiring a cast for six weeks.  The victim experienced severe pain, which she estimated an 8 on a scale of 1 to 10.  In the months following the attack, the victim had residual vision, breathing, and mobility problems, as well as a collapsed eardrum that took eighteen months to heal.

Officers David Kelch and Tyler McClintock with the Murfreesboro Police Department responded to the call at the victim's residence.  The suspect vehicle, a black Ford F-150 truck, was parked in the street outside the home when they arrived.  The garage door was open, and the officers observed a male figure, identified as the defendant, walking toward the driveway.  Officers ordered the defendant to drop an item held in his hand, which turned out to be a key fob to the victim's Jeep.  Officer McClintock detained the defendant, while Sergeant Stephen McGowan, who arrived in the meantime, entered the residence.  Officer Kelch followed Sergeant McGowan into the house, and they found the victim in the bedroom with her hands bound with duct tape and covered in such a large amount of blood one could not ascertain where she was injured.  The victim could speak but struggled to make her voice heard.

Officers found a large, unsheathed knife on the kitchen counter, as well as three knives on a table near the front door.  A cache of weapons was also found inside the defendant's vehicle, including two pistols, a knife, three assault rifles, a hunting rifle, a katana sword, a tomahawk, a machete-style knife, a crossbow, and plated body armor.  Three knives were found on the defendant's person.  While the officers were still at the scene, the defendant told Officer McClintock that he had intended to give his guns away to a friend before taking pills to commit suicide.  In light of that statement, the defendant was taken to the hospital for a suicidal evaluation and then to jail for booking after he was medically cleared.

At the close of the State's proof, the defendant made a motion for judgment of acquittal with regard to the two kidnapping charges, as well as the charges for preventing another from making an emergency call, possession of a firearm while under a court order, and possession of a firearm during the commission of a dangerous felony.  The defendant provided extensive argument in support of his motion, and the State provided counter argument.  After a brief recess, the trial court partially granted the defendant's motion, ruling it would charge the jury with aggravated kidnapping not especially aggravated kidnapping.  The court found that "the confinement was incidental to the Aggravated Assault," and there was no proof that the defendant used a deadly weapon or inflicted serious bodily injury during "the subsequent kidnapping or false imprisonment." The trial court denied the motion with regard to the emergency call and two firearm possession charges.

The defense then called the defendant to testify on his own behalf. The defendant said that he left the house around 5:00 p.m. on May 17, 2021, to work an overtime shift. While at work, he received a text from the victim about money. The defendant felt hurt and unappreciated by the victim's text, explaining that he was "working 76 hours a week and trying as hard as [he] c[ould]." He responded back, "if we're not going to do it together, let's sell the house and go our separate ways." The defendant claimed that he and the victim rarely argued about money and explained how they split their joint bills.

That night, the defendant left work around 10:00 p.m. and headed home, exhausted from having worked overnight the night before. Once he arrived, he went upstairs to the victim's office where she was finishing up work. He sat down on the corner of the victim's desk and asked her what was wrong. The victim responded, "you are ripping me off" and walked toward the defendant with her phone in her hand. The defendant thought the victim was going to show him something on the phone, but she must have hit him with the phone because the next thing he saw was "real bright light." He sat there shaking his head, when "someone" grabbed him and pulled him off the desk. The person pulled him across the floor, and the defendant thought it must be the victim's brother who was twenty-five years his junior. The defendant elaborated that the victim's brother was "not really stable" and known to come by the house unannounced.

The defendant fought back as he believed he was being pulled toward the stairs. He "panicked" and reached out, grabbing at the person he believed was attacking him, but then realized "[n]obody was pulling at that point." When his vision recovered, he saw that the victim had her left hand around the small knife he wore on a necklace. The victim's hand "popped" when he tried to open it and, not wanting to hurt her, he cut the strap from the knife and threw it down. He then noticed that the victim was badly injured.

Being trained as a first responder, the defendant tried to get the victim to communicate, but the victim did not respond. The victim vomited, which caused the defendant to worry she might choke. The defendant asked the victim what they should do given her background in nursing, and the victim said, "let's just go [lie] down on the bed." The defendant thought it was a good idea because the bed tilts up and that would keep her from choking. They eventually got up and walked downstairs towards the bedroom. The victim started walking towards an exterior door, but the defendant "was afraid with her being hurt so bad, and her vision and everything, she'd get hurt worse," so he said, "Let's just go [lie] on the bed."

In an effort to stabilize the victim and prevent her from hurting herself, the defendant used duct tape to restrain her. The defendant told the victim that he was going to kill himself because he "couldn't live with what had happened." The victim told the defendant that she needed to go to the hospital, and he searched the house looking for one of their

phones. Assuming his phone must be in the truck, he grabbed two bottles of liquor and "a bunch of pills" that he planned to use to kill himself and left the house in the truck. As he drove, he noticed that his vision was still compromised and that he was out of gas. He pulled into a gas station where he overheard that the police were looking for him. He returned home, parked in front, and walked into the garage, knowing that the police were on the way. When the police confronted him, he hesitated and held up his hand like he had a gun hoping they would shoot and kill him. Thinking of his family, though, he dropped his key fob and surrendered.

On cross-examination, the defendant acknowledged that he previously gave a statement in which he claimed that he went home that evening because the victim asked him to. The defendant also acknowledged that when he arrived home that night, there were no other cars in the driveway or anyone in the house aside from the victim. The defendant asserted that the victim hit him with her phone after he mentioned "Vickie," a woman with whom the defendant claimed the victim believed him to be having an affair. The defendant believed the victim's hitting him across both eyes with her phone was the reason for his "grossly attached [sic] retina." Asked about the bruising around the victim's neck, the defendant speculated that he must have grabbed her neck when he "panicked to keep [from] being drug down the stairs." When questioned as to how anyone could have pulled him down the stairs when the stairs leading out of the office went up, the defendant explained that he "didn't know where [he] was at" and that was "[t]he only thing that popped in [his] mind was stairs." The defendant claimed that when his vision came back, he saw that the victim "was hurt, but she wasn't bleeding that much."

The defendant explained that he did not call 911 to seek assistance for the victim because he could not find a phone in the house. However, he admitted that he texted the victim, "bye," when he was leaving in the truck. The defendant asserted that he was going to call 911 for help after putting gasoline in his truck had he not overheard the police officer and knew they had already been called. The defendant claimed that the doorknob to the bedroom fell off the door, he did not intentionally remove it. The defendant also claimed that he put the cache of weapons, along with other items, in his truck the morning of the incident to take to his sister's house for storage and that the victim would not have known this because she was working.

The defendant was taken to the hospital to ensure he had not swallowed pills after his expression of suicidal intentions. Dr. Tyler Armstrong examined the defendant during the early morning hours of May 18, 2021. Dr. Armstrong conducted a physical examination as part of this visit, and the defendant did not report any injuries to his eyes. The defendant explained that he did not disclose his eye injuries to the doctor evaluating him because he was distraught about the victim and thought the doctor only wanted to

know whether he had taken any pills. However, he later notified the jail staff that his vision was impaired and was ultimately diagnosed with a "grossly detached retina."

Following the conclusion of the proof, the jury returned verdicts convicting the defendant of two counts of aggravated kidnapping, two counts of aggravated assault, one count of the lesser-included offense of assault, and one count each of preventing another from making an emergency call, possession of a firearm while under a court order, and possession of a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court imposed an effective sentence of fifteen years' incarceration. The defendant appealed.

## *Analysis*

On appeal, the defendant challenges the sufficiency of the evidence supporting all of his convictions except the conviction for possession of a firearm while under a court order. We will address each in turn below.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* This Court will not exchange its "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

## I. Aggravated Kidnapping

In Counts 1 and 2, the defendant was respectively convicted of aggravated kidnapping involving the possession or threatened use of a deadly weapon and aggravated kidnapping during which the victim suffered bodily injury. As to these convictions, the defendant argues that there was no proof he possessed a weapon during the removal or confinement of the victim or that the victim sustained bodily injury during the timeframe relevant to the aggravated kidnapping. The defendant bases his argument on the drawing of a demarcation line in which the assaults occurred in the victim's office upstairs and the "kidnapping" occurred downstairs. However, the State asserts that kidnapping is a continuous offense, noting the victim testified that she did not feel free to leave from the time the defendant told her that he was going to kill her and threw her on the floor until the police arrived. Under the State's theory, the jury "could consider what took place from the outset of the confinement to its conclusion" to determine whether an aggravated kidnapping occurred. We agree with the State.

Aggravated kidnapping is a "false imprisonment . . . [w]here the victim suffers bodily injury; or . . . [w]hile the defendant is in possession of a deadly weapon or threatens

the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(4), (5). "Bodily injury" involves "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(3). False imprisonment is the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. *Id.* § 39-13-302(a).

In *State v. White*, our supreme court determined that when a defendant is charged with kidnapping and another felony, the removal or confinement must have "criminal significance above and beyond that necessary" to accomplish the accompanying felony in order to sustain the conviction for kidnapping. *White*, 362 S.W.3d 559, 577-78 (Tenn. 2012). If the confinement or removal associated with a kidnapping charge is merely incidental to accomplishing another felony, "such as robbery, rape, and assault," the defendant cannot be convicted of the kidnapping charge in addition to the underlying felony. *State v. Alston*, 465 S.W.3d 555, 562 (Tenn. 2015). Factors for the jury to consider in determining whether the State has proven every element of a kidnapping charge that arises out of the same conduct against the same victim of an accompanying felony include "the nature and duration of the victim's removal or confinement by the defendant"; "whether the removal or confinement occurred during the commission of the separate offense"; "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." *White*, 362 S.W.3d at 580-81.

In this case, the defendant does not dispute that the trial court properly instructed the jury as required by *White*. Accordingly, because the jury was properly instructed and determined the victim's confinement was not essentially incidental to the accompanying felony, this Court reviews the defendant's claim under the sufficiency of the evidence standard. *Alston*, 465 S.W.3d at 562.

Looking at the facts of this case, in light of *White*, we conclude there is sufficient evidence to support the jury's determination that the victim's removal or confinement exceeded that necessary to accomplish the assaults. The crime of kidnapping is a continuing offense. *State v. Legg*, 9 S.W.3d 111, 118 (Tenn. 1999).[2] "[A] defendant

---

[2] Although the issue in *Legg* was territorial jurisdiction, it has been observed that kidnapping is a continuing offense in cases addressing sufficiency of the evidence. *See, e.g.*, *State v. Burgins*, 2022 WL 2317028, at *20 (Tenn. Crim. App. June 28, 2022) (citing *Legg* and determining that one kidnapping conviction per victim was appropriate where the defendant "continuously confined each victim from the beginning of the

- 10 -

continues to commit the crime at every moment the victim's liberty is taken." *Id.* at 117. Therefore, we can look at what took place during the entire period of confinement. The victim testified that she did not feel free to leave from the time the defendant told her that he was going to kill her and threw her on the floor until the police arrived, a time period lasting more than an hour. At least for a portion of this time, the defendant possessed a knife, which he wore on a chain around his neck and at one point used to press to the victim's neck. The victim sustained numerous injuries during the ordeal, including lacerations, a broken nose, petechial hemorrhaging, ligature marks, and a broken hand. The victim's confinement continued downstairs, where the defendant stopped the victim's attempt to escape under the ruse of taking the dog out, denied her medical assistance, duct-taped her wrists and ankles, placed her on the bed in a locked room, and removed phones from the home. Having been properly instructed according to *White*, the jury was within its province in finding that the defendant's confinement of the victim was to a greater extent than that necessary to commit assault. Put another way, the jury could reasonably determine that the kidnapping began when the defendant first entered the victim's office and started the assault and did not end until the police arrived, i.e., the defendant's kidnapping was more than merely "incidental" to the assault.

The defendant relies on the trial court's statements at the motion for judgment of acquittal to assert that the assaults only occurred upstairs in the office, and the kidnapping occurred separately downstairs sometime after the violence ceased. We determine that any ruling the trial court made suggesting such distinction is contrary to the evidence based on the victim's testimony that she did not feel free to leave from the moment the defendant threw her to the floor upstairs.

The evidence is sufficient, and the defendant is not entitled to relief.

## II. Aggravated Assault and Assault

In Counts 3 and 5, the defendant was respectively convicted of aggravated assault by strangulation and aggravated assault resulting in serious bodily injury and, in Count 4, assault based on causing the victim fear of bodily injury. As to these convictions, the defendant argues that the evidence is insufficient because he acted in self-defense. The defendant asserts that he never intended to harm the victim or cause her to reasonably fear imminent bodily injury, but instead, "acted to protect himself against a perceived attack while blinded from being struck in the eyes." The State responds that the jury was within

---

robbery and the [d]efendant's fleeing the apartment after the rapes"), *perm. app. denied* (Tenn. Nov. 16, 2022); *State v. Perry*, 2015 WL 3540554, at *15-*17 (Tenn. Crim. App. June 5, 2015), (citing *Legg* and determining evidence sufficient to sustain kidnapping convictions where victims were bound to a cot multiple times over an almost two-year time period but unrestrained other times), *perm. app. denied* (Tenn. Oct. 15, 2015).

its province in accrediting the victim's testimony and finding the defendant's testimony incredible and rejecting his claim of self-defense. We agree with the State.

Relevant here, a person commits assault who intentionally or knowingly causes another to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(2). A person commits aggravated assault who commits an assault, and the assault results in serious bodily injury to another or involved strangulation or attempted strangulation. *Id.* § 39-13-102(a)(1)(A)(i), (iv). The defendant does not dispute that the State established the essential elements of aggravated assault or assault, but instead, asserts that the evidence is insufficient because he acted in self-defense.

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). At the time of the offense, the applicable statute provided:

(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b). When self-defense is fairly raised by the proof, the State is required to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020).

The defendant testified that the victim struck him in the eyes with her phone, causing temporary blindness, and during such blindness, he felt someone pulling him and believed he was struggling with the victim's younger and stronger brother. The defendant flailed at his believed-to-be assailant before eventually realizing that only the victim was present and had been badly hurt in the process. However, the defendant acknowledged on cross-examination that he did not see the victim's younger brother in the house or his car in the driveway when the defendant arrived home a short time earlier. The defendant also acknowledged that the victim's home office where the attack occurred was recessed, and therefore, it would have been impossible for him to fall down the stairs as he claimed to have been worried about during the attack. The jury heard the defendant's explanation for his actions, as well as the victim's testimony depicting the defendant as the first and only aggressor, and, as was its prerogative, rejected the defendant's claim of self-defense. *Goode*, 956 S.W.2d at 527. The defendant is not entitled to relief.

## III. Preventing Another from Making an Emergency Call

In Count 6, the defendant was convicted of preventing another from making an emergency call. As to this conviction, the defendant argues there was no proof he prevented the victim from accessing a phone. The State responds that there was sufficient circumstantial evidence from which the jury could conclude that the defendant removed the operational phones from the home to prevent the victim from summoning aid. We agree with the State.

Tennessee Code Annotated section 65-21-117(a) provides that it is an offense to "knowingly prevent[] another individual from placing a telephone call to 911 or from requesting assistance in an emergency from a law enforcement agency, medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals."

The defendant asserts that the victim never asked the defendant to give her a telephone or testify that the defendant took away or disposed of her phone. The defendant claims, rather, that he searched the home looking for a phone with which to call for assistance but was unable to find one. The victim testified that she put her phone in a desk drawer at the end of their exchange over finances and went back to work. Later, after the victim crawled to her office bound by the duct tape restraints, she discovered that her phone was no longer in the desk drawer. The defendant was the only other person in the home that evening, and he had earlier refused the victim's request to obtain medical assistance and indicated that he "wasn't going to jail." In addition, even though the defendant claimed that he could not find a phone with which to call 911, he texted "BYE" to the victim's number when he left the house but did not call for assistance. Based on the sum of the circumstantial evidence viewed in the light most favorable to the State, the evidence was

sufficient for the jury to find that the defendant removed the operational phones from the home to prevent the victim from summoning aid.

## IV. Possession of a Firearm

In Count 8, the defendant was convicted of possession of a firearm during the commission of a dangerous felony, specifically, aggravated kidnapping in Count 2. As to this conviction, the defendant argues that the "proof failed to establish that he possessed a firearm at any point during the alleged kidnapping." The State responds that possession can be actual or constructive, and the proof was that the defendant had guns throughout the house that he had the ability to control and exercise dominion over.

Constructive possession is established when a person has "'the power and intention at a given time to exercise dominion and control over [an object] either directly or indirectly or through others.'" *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). "Constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (quoting *State v. Transou*, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996)).

The victim testified that the defendant had a variety of firearms that he normally kept "[t]hroughout the house." When the ordeal was over and officers searched in the defendant's truck, they found a cache of weapons, including two pistols, three assault rifles, and a hunting rifle. The defendant indicated in his testimony that he put the guns in the vehicle earlier in the day planning to take them to his sister's house before they had "contractors coming in." On the contrary though, Officer McClintock testified that the defendant told him that he had intended to give his guns away to a friend before taking pills to commit suicide. In addition, the victim testified that while she was duct-taped to the bed, she heard the defendant rambling around the house for 30-40 minutes. The jury could determine, in its province, that the defendant put the guns in his truck during that time. In sum, the timing of when the guns were put in the truck was a question for the jury and, by its verdict, the jury determined that the guns were in the home during the period of the kidnapping and were able to be reduced to the defendant's actual possession. The defendant is not entitled to relief.

Additionally, though not raised at trial or in his brief to this Court, the defendant maintained during oral argument before this Court that the weapons were not loaded, and therefore, the State was unable to establish the "intent to go armed" element of the charged offense. While our review of the record revealed no testimony establishing whether or not the guns were loaded, our review Exhibit 6C revealed that not only were several weapons found in the defendant's possession as discussed *supra*, but several magazines of ammunition and at least one box of ammunition were also found in the defendant's truck,

and therefore, in his possession. Based on the location of the ammunition in relation to the weapons and the ease with which the weapons could be loaded, the evidence is sufficient to establish the defendant's intent to go armed and, therefore, sufficient to sustain the jury's verdict and the defendant's conviction. *See State v. Watkins*, No. 2020-01006-CCA-R3-CD, 2021 WL 5919119, at *7 (Tenn. Crim. App. Dec. 15, 2021) (evidence is sufficient to sustain a finding of the intent to go armed when shotgun shell was found "within five feet" of an unloaded shotgun and "the shotgun could have been loaded 'within a matter of seconds'").

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE